CAMDEN AND ROCKLAND
WATER COMPANY

v.

MAINE PUBLIC UTILITIES
COMMISSION.

Supreme Judicial Court of Maine.

Argued May 8, 1981.

Decided Aug. 6, 1981.

Drummond, Woodsum, Plimpton & MacMahon, P. A., Thomas H. Allen (orally), Portland, for plaintiff.

Horace S. Libby, Stephen A. Johnson, Charles F. Dingman (orally), William E. Furber, Public Utilities Commission, Augusta, Paul Gibbons, Camden, for defendant.

Before WERNICK, GODFREY, ROBERTS and CARTER, JJ.

ROBERTS, Justice.

The Camden and Rockland Water Company seeks review under 35 M.R.S.A. §§ 303 and 305 of a decision by the Public Utilities Commission on the Company's petition for a rate increase. The Company raises several points on appeal addressed to the Commission's calculations of rate base and cost of equity. We find the Commission's decision inadequate in two areas and therefore remand the case to the Commission.

The Company supplies water to Camden, Rockland, Thomaston, Rockport, Owl's

Head, and Warren and is ninety-two percent owned by the Consumers Water Company. On November 11, 1979, the Company applied for a 26.2 percent rate increase, for a revenue increase of $462,052, to be effective December 8, 1979. Following the Commission's suspension of the proposed rates, the towns of Camden, Rockland, and Thomaston intervened. The Commission granted a revenue increase of $197,895 on August 8, 1980. On August 19, the Commission approved the Company's revised rate schedule. The Company then petitioned for a rehearing on August 25 to modify the Commission's order, requesting an increase of $236,000. The Commission denied the petition. The Company appealed the Commission's decision under 35 M.R.S.A. § 303 and filed a complaint for review under 35 M.R.S.A. § 305. The section 303 appeal and section 305 complaint were ordered consolidated for hearing by this Court.

 The goal of ratemaking is to provide "just and reasonable" rates, 35 M.R.S.A. § 51. Meeting this goal entails the Commission's balancing two public interests. One is the public interest in low utility costs. The second is the interest in the utility's continued operations. Therefore, the Commission must set rates that will provide the utility with the opportunity to earn a return sufficient to meet its operating expenses and, by allowing a fair return to its investors, to attract necessary capital at reasonable rates. *Id.; see New England Telephone & Telegraph Co. v. Public Utilities Commission*, Me., 390 A.2d 8, 14 (1978). The allowed return to the utility is calculated as the product of the utility's rate base times the rate of return. Here, the Company contends that the Commission made errors in its calculation of both of these components, resulting in too low a return.

I. *Rate Base*

 Rate base is defined as the value of the utility's investment on which it is allowed to earn a return. Title 35 M.R.S.A. § 52 limits the allowed rate base to "all property . . . used or required to be used in its service to the public within the State."

The Company proposed a rate base of $4,186,828. The Commission eliminated certain proposed items and reduced others, resulting in a rate base of $3,892,155. The Company contends that the low return resulting from the Commission's calculation of rate base, as well as specific errors in the Commission's methodology, made the rate base unreasonable.

A. *The Actual Investment Comparison*

 The Company argues that the Commission set its rate base so far below its actual investment that the Company cannot earn the authorized rate of return on its capital, which, it concludes, is confiscatory. According to the Company, the Commission had a statutory obligation under 35 M.R.S.A. § 51 to provide the utility with the opportunity to earn a reasonable rate on its investment. This result is necessary, the Company reasons, because the utility must earn the authorized return on substantially all of its capital investment in order to attract further capital on reasonable terms. Therefore, rate base must approximate total capitalization, making the rate of return on each comparable.

The Company makes several comparisons between its authorized return on equity and its actual return on investment and between rate base and total capitalization to show that the return derived from the Commission's calculated rate base was too low. For example, although the authorized cost of equity was 13.75 percent, the Company could earn a maximum of only 11.19 percent on its actual equity investment with the allowed rate base. According to the Company, the Commission acted unreasonably because it refused to reevaluate its rate base calculations in light of the resulting low return, instead treating rate base solely as the sum of several components whose inclusion or exclusion is determined independently of the overall result. Rather, the Company argues, the Commission should approach rate base as a flexible concept requiring it to include items as necessary to provide an adequate return. The Company concludes that the Commission therefore

erred by excluding from rate base many of the Company's proposed entries.[1]

We find two problems with the proposed comparisons. First, the Commission is not statutorily authorized to consider return on total investment in determining rate base. Title 35 M.R.S.A. § 52 expressly limits the Commission's consideration to property in service. Although the Company correctly points out that the Commission is obligated to ensure that the utility has the opportunity to earn sufficient revenues to provide an adequate return to its investors, the legislature has provided the return on rate base, not the return on total capitalization, as the measure of that amount. Therefore, we do not consider comparisons between allowed return on rate base and actual return on total investment as indicating an inadequate rate base.

Second, we have developed a carefully circumscribed standard of review over the Commission's decisions that reflects in part the Legislature's placing the Commission in a position of expertise with authority to use its discretion in setting utility rates. *New England Telephone & Telegraph Co. v. Public Utilities Commission*, Me., 390 A.2d 8, 48 (1978). We do not possess the same degree of expertise, nor is it our function to override essentially legislative decisions. *Id.*

In earlier cases we have stated that our scope of review includes reviewing the reasonableness of the results of the Commission's decision. Generally, we discussed this standard where the issue concerned the methodology used by the Commission in computing rate of return, *New England Telephone & Telegraph Co. v. Public Utilities Commission*, Me., 390 A.2d 8, 48–49 (1978), or a specific component of the rate calculation, *e. g., Mars Hill & Blaine Water Co. v. Public Utilities Commission*, Me., 397 A.2d 570, 576 (1979) (effective federal income tax rate); *Casco Bay Lines v. Public Utilities Commission*, Me., 390 A.2d 483, 494 (1978)

(reduction in liability insurance expense). In *Mars Hill* we first described our review as limited to "whether the Commission's methodology and result were reasonable." 397 A.2d at 576. Later in the opinion we clarified under what conditions we would find the result unreasonable: "If the methodology is reasonable, then the result will not be disturbed if the factual findings employed in that methodology are supported by the record." *Id.* at 576. Here, in contrast, the Company does not allege that the results are not supported by substantial evidence. We reject the Company's actual investment comparison, and turn therefore to the Company's criticisms of specific methods used by the Commission in computing rate base.

### B. Test Year Average Rate Base

■ Because of the need to establish a fixed period in which to calculate rate base and rate of return, the Commission uses the utility's financial information taken from a test year. Here, the Commission chose 1979 as the test year. Because the rates derived from the test year experience are set prospectively, the Commission must then revise the test year results to account for changes in the utility's financial position likely to occur in the future. See J. Bonbright, *Principles of Public Utility Rates*, 150 n. 7 (1961).

The utility's actual rate base changes over the course of the test year as a result of additions and subtractions to capital items. The test year rate base, therefore, must be measured at the points that will most accurately reflect the total rate base. Two methods of measurement are generally used. One is the year-end rate base, which measures the rate base on the last day of the year. The other, the year-average rate base, requires averaging the rate base at several points during the year.[2] Although

1. The Company would include in this class of discretionary rate base entries construction work in progress (C.W.I.P.) and unamortized rate case expense, as well as amounts for other deferred debits and materials and supplies. The Company does not contend that the dele-

tion of these items would be improper in every situation.

2. Although the parties refer to this method as the average-year rate base, we prefer to call it the year-average rate base to reflect more accu-

it employed the year-end method in prior water company cases, the Commission used here a year-average rate base, contending that this method most accurately matches investment with revenue and expenses throughout the test year. In contrast, according to the Commission, by measuring only the rate base at the end of the year, the year-end method exaggerates the level of investment necessary to produce that year's revenue.

The Company argues that the Commission's choice of the year-average rate base was nevertheless unreasonable. The Commission recognized that it must adjust the test year data to reflect changes reasonably certain to occur in the future. The Company contends that the Commission therefore cannot choose a method of computing rate base that fails to account for known increases occurring between the test-year midpoint, which the year-average method effectively treats as the measuring date, and the end of the test year. As a result, the Company reasons, because the Commission's order was issued on August 8, 1980, using a rate base calculated as of June 30, 1979, the use of the year-average rate base limited the Company's return to the property in service over thirteen months before the rates became effective.

The Company acknowledges that the Commission included in its calculation of rate of return an allowance for attrition of .5 percent.[3] The Company contends, however, that although this attrition allowance may have compensated for the reduction in return during the year after the rates went into effect, it did not compen-sate for additions to actual rate base during the second half of the test year. Because the Commission did not adequately compensate for the loss resulting from its use of a year-average rate base, the Company concludes, that choice was improper.

We have recognized that the Commission may include in its calculations of return an adjustment for attrition. *Maine Water Co. v. Public Utilities Commission*, Me., 388 A.2d 493, 498 (1978). The Commission correctly asserts that the adjustment can also compensate for regulatory lag.[4] The Company has failed to persuade us that .5 percent was an inadequate adjustment for attrition even as accentuated by regulatory lag. This is especially so because the parties did not specify what the adjustment was for when they stipulated to the amount. Use of a year-average rate base coupled with a specific attrition allowance has been considered to be an acceptable substitute for a year-end rate base, *New England Telephone & Telegraph Co. v. Department of Public Utilities*, 360 Mass. 443, 275 N.E.2d 493 (1971); *Providence Gas Co. v. Burman*, R.I., 376 A.2d 687 (1977), and the Commission has used the year-average rate base previously. *Central Maine Power Co. v. Public Utilities Commission*, Me., 382 A.2d 302, 316 n. 19 (1978). Therefore, we cannot consider the Commission's use here of the year-average rather than year-end rate base to be unreasonable.

### C. Working Capital

The Company next addresses the Commission's calculation of the working capital component of rate base. Working capital

rately the actual measuring procedure. The Commission does not necessarily choose an average year for the rate base calculation; it merely averages the rate base of the test year.

**3.** Attrition refers to the reduction in the utility's rate of return caused by inflation. As expenses and the cost of capital investment rise, the ratio of return to actual rate base declines relative to the ratio at the time the rate of return was calculated. *See New England Tel. & Tel. Co. v. Pub. Util. Comm'n*, Me., 390 A.2d 8, 47 (1978). The parties stipulated to the attribution allowance, so its size is not at issue.

**4.** We have defined regulatory lag as "the loss of earnings that occur between the time the utility files for a rate increase and the date when the new rates actually become effective." *Maine Water Co. v. Public Util. Comm'n*, Me., 388 A.2d 493, 497 (1978).

The Company notes that the Commission usually takes the statutory maximum period of nine months to rule on rate increase applications, thereby increasing the costs to the utility resulting from regulatory lag. In this case, the Company filed its proposed rate increase on November 8, 1979, and the Commission issued its Order on that proposal on August 8, 1980.

refers to the additional funds the investors must provide to meet the utility's operating expenses. This need arises, in part, because of the delay between when the utility incurs the costs of providing services and when it receives payment for those services. *New England Telephone and Telegraph Co. v. Public Utilities Commission*, Me., 390 A.2d 8, 50 (1978).

The Commission used a lead-lag study to compute working capital. This method has two components. The revenue lag measures the average period between when the utility provides services to its customers and when it receives payment. The expense lag measures the average gap between the utility's receipt of goods and services and its payment for them. Net expense lag is subtracted from net revenue lag to determine the net working capital requirement. A positive net working capital allowance is added to rate base because it represents an additional contribution to capital by the investors on which they should earn a return; a negative working capital allowance is subtracted from rate base. The Company calculated a positive working capital allowance of $82,682. The Commission, however, found net working capital to be negative $27,828. On appeal, the Company challenges the Commission's calculation of the federal income tax and local property-tax components.

### 1. *Federal Income Tax*

■ The Company files its federal income tax return on a consolidated basis with its parent, Consumers Water Company, and the other Consumers subsidiaries. The Commission chose the actual payment dates for the consolidated return to calculate the expense lag associated with federal income tax. The Company contends that the Commission should have used the dates on which the Company would submit payments if filing an individual return. The Company first asserts that the Commission lacks jurisdiction to consider the consolidat-

ed tax return payment dates because those dates reflect the peak seasonal incomes of several affiliated companies outside of Maine. Next, the Company attempts to distinguish our prior cases upholding use of the consolidated returns to measure tax expense on the ground that in those cases the Commission required sharing of tax benefits resulting only from chronic-loss companies.[5] *See Maine Water Co. v. Public Utilities Commission*, Me., 388 A.2d 493, 494–95 (1978); *Mechanic Falls Water Co. v. Public Utilities Commission*, Me., 381 A.2d 1080, 1094 (1977).

Our prior cases involving the federal income tax component of working capital have addressed amount of taxes, not payment dates. The principles underlying those opinions, however, apply here. In *Mechanic Falls*, we found no jurisdictional obstacle to the Commission's considering an effective tax rate that reflected gains and losses of affiliated companies located outside of Maine, 381 A.2d at 1093. We reasoned that the utility's actual tax expense was its proportionate share of the consolidated return, not the amount it would have paid if filing individually, so that the ratepayers should only reimburse the utility for its share of the consolidated tax expense. *Id.* at 1094–95. Similarly, here the ratepayers should receive the benefits from the actual payment dates of the consolidated return.

We do not find persuasive the Company's distinguishing our prior cases as applying only to the tax benefits accruing from chronic-loss companies in the consolidated group. In those cases, the Commission did use a "chronic loss" theory for computing effective tax rates. Our holdings, that the Commission's method of apportioning the benefits of a consolidated tax return was reasonable, however, was not meant to limit the Commission's method of determining the effective tax rate. The Commission's use of the consolidated federal income tax

---

**5.** In those cases, the court distinguished between chronic-loss and actual-loss companies. The terms chronic loss and actual loss refer to the tax status of the affiliated companies. The

distinction is not relevant here. *See Mechanic Falls Water Co. v. Public Utilities Commission*, Me., 381 A.2d 1080, 1094 nn. 24 & 25 (1977).

return payment dates here is not inconsistent and is reasonable, so we find no error. *Mars Hill & Blaine Water Co. v. Public Utilities Commission*, Me., 397 A.2d 570, 576 (1979).

## 2. Local Property Taxes

██ We cannot reach the same conclusion on the local property tax element of working capital. The Commission calculated a property tax working capital requirement of negative $32,839, based on 80.29 net lag days between receipt of services and payment of taxes, compared to the Company's positive $34,166 for 83.74 net lead days. The difference results in part from the parties' different views on when the Company receives municipal services in exchange for its taxes.

Two dates are significant for computing the expense lead or lag associated with taxes. The first is the payment date. The second is the date on which the utility is considered to receive the governmental services paid for by its taxes. Because a year's taxes normally pay for services provided over a twelve month period, the midpoint of that period is used as the date of receipt of services in calculating the expense lead or lag. The Company contends that its taxes pay for services received during the tax year, from April 1 to March 31. It therefore calculated the expense lag from October 1, the midpoint of the period. The Commission, in contrast, treated the Company as paying for services received during each town's fiscal year, which, with the exception of Hope, was the calendar year. It therefore used a midpoint of the fiscal years, which was July 1 for the calendar-year towns and August 1 for Hope.

It is not clear from the record how the parties arrived at the figures of 80.29 net lag days and 83.74 net lead days or why a 90-day difference in midpoints should create such a disparity. The Commission's staff originally presented a computation based on payment at the time of commitment (presumably the date established by vote of each town pursuant to 36 M.R.S.A. § 505(1)). The Staff later presented different calculations based on the latest date taxes were payable without interest (presumably established pursuant to 36 M.R. S.A. § 505(4)). The Company apparently used the actual date of payment, which for all towns except Camden was very close to the latest date payable without interest. We do not attempt to review the computations of the parties. Instead, we deal only with two areas of disputed methodology: (1) use of last date for payment without interest versus actual payment date and (2) use of fiscal-year midpoint versus tax-year midpoint.

We agree with the Commission on the first point. The use of the last date for payment without interest is more consistent with the purpose of the lead-lag analysis. Since the purpose of the analysis is to determine the working capital requirements of the Company, we think it appropriate that the Commission assume payment of taxes on the latest date payable without interest, in accordance with normal business practice.

We cannot say, however, that the Commission's result with reference to the second issue is reasonable. The Commission's computation appears to be inconsistent with its methodology and may reflect a misconception of the underlying question. The Staff, in its brief to the Commission, stated: "The proper question to ask is over what operating period the payment received by the Town will be applied to finance the services received in return for the taxes." By focusing on the period over which the town budgets the tax revenue, the Staff could then conclude that the Company pays for municipal services provided during the town's fiscal year. The Commission accepted the Staff's analysis, considering the result to be a consequence of "the time during which the Company actually received the municipal services for which it paid."

We agree with the Commission that the actual receipt of municipal services for which the Company paid is the determinative time frame. By relating the Company's payment to the town's allocation of that payment to cover its operating costs,

however, the Commission may have distorted the nature of the Company's tax liability. If the Company paid an annual land rent, the determinative time frame would be the rental period without regard to the landlord's fiscal year. We believe the taxable year, from April 1st to April 1st, as provided by 36 M.R.S.A. § 502 defines the period of municipal services (and county services) for which the Company pays when paying local property taxes regardless of whether the tax rate is based upon a fiscal year budget.

That the taxable year is the period for which the Company pays is illustrated by the testimony of Mr. Horton, a witness from the intervenor towns:

Q. But in truth and in fact in each municipality served by Camden & Rockland Water Company when you pay your 1979 tax bill, you are paid through March 31 of 1980. Isn't that a fact, Mr. Horton?

A. That is a fact.

Q. If a company were to liquidate on March 31st of any given year, would it be your opinion they would owe any additional municipal taxes?

A. They would not.

In contrast, to be consistent with the Commission's position, if the Company liquidates in the first three months of the year, it would owe an additional amount for those months because its tax payment would be allocated as payment for the prior calendar year.

Both parties discuss at length the working capital analysis in *New England Telephone and Telegraph Co. v. Public Utilities Commission*, Me., 390 A.2d 8 (1978), and each concludes the case supports its position. There, the working capital issue concerned the expense lag associated with the license contract expense, which was New England Telephone's share of the cost of services provided by A.T.& T. for its subsidiaries, such as use of patents and research and development. Under the contract between N.E.T. and A.T.& T., the amount billed each month was equal to N.E.T.'s allocated share of A.T.& T's actual costs of providing these services in the second pre-

ceding month. N.E.T. received the bill on the first of each month and paid nine days later. In order to compute the lag between receipt of services and payment, the Commission had to determine when N.E.T. incurred the expense. N.E.T. contended that it incurred the cost for each installment in the month it received and paid the bill. The Commission took the position that the Company incurred the expense in the month used to determine N.E.T.'s share of A.T.& T.'s cost of providing the service, which was the second preceding month, thus increasing the expense lag.

In affirming the Commission, we reviewed the Commission's reasoning. First we said: "The Commissioner reasoned that the expense was 'incurred' during the month which was used to determine New England's allocated share of A.T.& T.'s cost of rendering such service." *Id.* at 52. The Commission now seizes upon this sentence to conclude that because the tax bill is calculated to cover the costs of the town's operations during its fiscal year, the Company incurs the tax expense over the same period.

In the next sentence, however, we shifted the focus to when the services were provided and thus the costs incurred: "In other words, New England incurred the expense during the same month A.T.& T. incurred the cost in rendering its License Contract service, i. e., the second preceding month." *Id.* Reflecting its emphasis on when the costs were incurred, the Court continued on to show that the service was actually provided, and thus the costs incurred, in the second preceding month, not when billed.

The parties' confusion on the holding in *New England Telephone* arises because, with A.T.& T.'s delayed billing, the period for which the charge was computed and the period during which the service was provided were the same. That is not always true, and it is not the situation here. Each town computes the amount of tax to cover its budget for the fiscal year, which includes a portion of the preceding tax year. The Company's payment, though, meets its tax liability and entitles it to municipal services for the taxable year.

We recognize that whether the tax allocation is reasonable does not necessarily depend on whether the Commission's calculations correspond exactly to reality, because ratemaking often rests on hypothetical constructs. *See Central Maine Power Co. v. Public Utilities Commission*, Me., 405 A.2d 153, 179–81 (1979). The Commission, however, must use methods that most reasonably measure capital requirements and are consistent with its construct. The Commission recognized this principle, for example, when it revised the working capital calculations for insurance.[6] We must remand that part of the Commission's decision based on the local property tax lead-lag analysis for reconsideration consistent with the Commission's methodology. To be consistent, the Commission should not rely on a method that reflects the fortuity of the towns' budgetary period rather than the period that the property tax payment actually covers.

## II. *Rate of Return*

 Rate of return is the rate at which the utility is entitled to earn a return on its rate base. The Commission used here the "cost of capital" method for computing rate of return. This method requires first determining the cost of each item of capital. Those amounts are then used in finding the weighted costs of each item, the sum of which becomes the rate of return. *See New England Telephone and Telegraph Co. v. Public Utilities Commission*, Me., 390 A.2d 8, 32 (1978). The Company challenges the Commission's calculation of the equity component of the cost of capital, specifically arguing that the Commission failed to include an allowance for cost of issuance in computing cost of equity. As the Company explains, this error resulted from the Commission's failure to distinguish between the yield to the investor on its equity investment and the cost of equity to the utility.

The Commission calculated a cost of equity of 13.75 percent, relying on the method proposed by the Staff's witness, Mr. Lowery. In computing the equity cost, Lowery first set a lower limit on return of about 13 percent, equal to the expected yield on Baa utility bonds. He reasoned that this amount represented the minimum return that an investor would accept because below this amount the investor would choose the less risky bond. Lowery then adjusted this amount upward, using a discounted cash flow analysis. The Company contends, however, that on subtracting a 10 percent cost of issuance, the return to the equity investor is only 12.5 percent. This return falls below the expected yield on Baa utility bonds, which the Commission used as the floor for equity return. This result, the Company concludes, is unreasonable.

The Commission responds that the cost of issuance adjustment was inappropriate because there was no evidence that the Company planned to issue new stock and because the Company furnished no objective evidence supporting its 10 percent cost of issuance estimate. The Commission concludes that its analysis was correct, absent evidence of a stock issue and "in the absence of any other proof of the propriety of such an adjustment."

The Commission is correct in observing that the Company planned no new stock issuance. The Commission is incorrect in concluding that the Company presented no evidence supporting its cost estimate. The record contained a study furnished by the Company of net proceeds percentages from stock offerings by other water companies. Finally, the Commission incorrectly concludes that there was no other proof of the "propriety" of the adjustment. Instead, by excluding this adjustment, the Commission acted inconsistently with its prior treatment of the same issue, both times to the detriment of the Company.

In its calculation of rate base, the Company had proposed to include a capital stock

---

6. The Staff initially treated insurance payments as providing coverage for the calendar year, with a midpoint for the lead-lag analysis of July 1. The Staff then accepted the Company's position that the insurance coverage was defined by the policy to extend from October 1 to October 1, with a service midpoint of April 1.

adjustment for an expense carried in the Company's books as the cost of issuance for stock issued in 1963. The Commission denied this adjustment, using reasoning contrary to its position on cost of equity:

> Moreover, as the Staff points out, the investors have already been compensated for this expense through the allowance, in the allowed rate of return on equity, for the costs of issuing new stock. Because the Commission's calculation of the rate of return already included this amount, the Commission would, in effect, be double counting if it now included this amount in the rate base to which that return applies.

The Staff, in fact, cited as a reason why it should not allow the adjustment the testimony of the Company's witness, Mr. Parker, on why the Commission should include the cost of issuance as an element in cost of equity:

> It is common practice, as illustrated by Mr. Parker's testimony on the cost of equity capital, to include in an analysis of the fair rate of return on equity an allowance for the cost of issuing new stock. In that manner, the investors in a utility are compensated for the costs of such issuance.

Although the Staff's comments here relate to a capital adjustment for computing rate base, which is separate from the issue of cost of equity, the Staff appeared to accept as proper practice the inclusion of cost of issuance in computing cost of equity. See *Legislative Utility Consumers' Council v. Granite State Electric Co.*, 119 N.H. 359, 402 A.2d 644, 648 (1979).

Here again, therefore, we must set aside that part of the Commission's decision based on the absence in its computation of cost of equity of any allowance for the cost of stock issuance. We defer to the Commission's expertise in its choice of methods of analysis where that choice is reasonable. We must require, however, that the Commission remain consistent in its application of those methods.

The entry shall be:

(1) The decision of the Commission is set aside in that part relating to (a) the local property tax lead-lag analysis and (b) the refusal to include the cost of issuance adjustment in determining rate of return.

(2) As to said issues, the case is remanded to the Commission for further proceedings in accordance with the opinion herein.

(3) In all other respects the decision of the Commission is affirmed.

All concurring.