**MILLINOCKET WATER COMPANY**

**v.**

**MAINE PUBLIC UTILITIES COMMISSION, et al.**

Supreme Judicial Court of Maine.

Argued May 7, 1986.
Decided Sept. 30, 1986.

---

Verrill & Dana, Roger Putnam (orally), Richard N. Bryant, Portland, for Millinocket Water Co.

Drummond, Woodsum, Plimpton & MacMahon, P.A., Thomas H. Allen, Portland, for amicus curiae Maine Water Co.

Morgan, Lewis & Bockius, Alan L. Reed, Philadelphia, Pa., for amicus curiae Nat. Ass'n of Water Companies.

Dale L. Gavin (orally), Joseph Donahue, for Maine Public Utilities Com'n, Augusta.

Clifford, Clifford & Stone, Alan G. Stone (orally), Lewiston, for Town of Millinocket.

Paul A. Fritzsche, Public Advocate, Augusta.

Before NICHOLS, ROBERTS, WATHEN, GLASSMAN and SCOLNIK, JJ.

ROBERTS, Justice.

On December 26, 1984 Millinocket Water Company (Company) filed a request with the Public Utilities Commission pursuant to 35 M.R.S.A. § 64 (Supp.1985) to increase the rates of its customers. The proposed rates were designed to produce a net increase in annual operating revenues equal to 34.8% or $153,500.

Following several days of public hearings, the Commission by order dated Sep-

tember 26, 1985 denied all of the Company's request except $27,197 and authorized a revised schedule of rates.[1] In its order the Commission also denied the Company its requested rate case expenses in excess of $100,000 by awarding the test-year expense of $5,889 as a normal annual rate case expense. The Company sought timely review of the Commission's order by filing both an appeal pursuant to 35 M.R.S.A. § 303 (1978) and a complaint under the authority of 35 M.R.S.A. § 305 (1978). Before us, the Company contends that the Commission erred in determining its cost of equity and in awarding only $5,889 in annual rate case expenses. For the reasons set forth below, we affirm the Commission's order and supplemental order in all respects and enter judgment for the defendant on the Section 305 complaint.

## I. Cost of Equity

In calculating cost of equity in this case the Commission employed the following methodology. In light of the fact that the Company is a wholly owned subsidiary of General Waterworks Corporation (GWC) the Commission, at the suggestion of the Company's cost of capital expert, used GWC as a proxy to determine the Company's cost of capital.[2] Because GWC, in turn, is wholly owned in equal shares by I.U. International Corporation and Lyonnaise American Holding, Inc., the Commission also accepted the expert's suggestion that GWC be compared to other utilities whose stock is publicly traded in order to employ the discounted cash flow method to determine cost of equity.

In its analysis, however, the Commission found the other utilities chosen by the Company's expert to be incomparable to GWC because his sample did not include utilities that earned a sizeable portion of their income from the sale of utility property. GWC, the Commission found, derived an annual average of 32.5% of its earnings from the sale of utility property over the 1978–1984 period. According to the Commission this pattern of deriving gains from non-utility operations reduced the risk inhering in equity ownership and lowered GWC's cost of equity.[3]

In order to take account of these sales, the Commission made an adjustment to the calculation of cost of equity for the sample group chosen by the Company's expert. After computing the sample's cost of equity to be 12% on the basis of a discounted cash flow analysis, the Commission reduced this figure by 32.5%, GWC's average gain from the sale of utility property, and arrived at a cost of equity of 8.1%.

On appeal, the Company argues that the Commission's 32.5% adjustment to the sample's cost of equity deprived it of a reasonable rate of return in violation of the United States and Maine Constitutions. It is the Company's position that through this adjustment the Commission indirectly worked a "flow-through" of gains, achieved by other geographically distinct subsidiaries owned by GWC, to Millinocket ratepayers, a practice prohibited in *Maine Water Co. v. Public Util. Comm'n*, 482 A.2d 443 (Me.1984).

---

**1.** By Supplemental Order dated November 6, 1985 the Commission approved the Company's revised schedule, which reflected a rate increase of $27,197.

**2.** Cost of capital is the annual percent that a utility must receive to maintain its credit, to pay a return to the owners of the enterprise and to insure the attraction of capital in amounts adequate to meet future needs. Thus, cost of capital involves a calculation of the interest the utility must pay on its borrowed capital (debt) and the cost of attracting and paying investors for its common or preferred stock (equity). Each of these figures is then weighted on the

basis of an appropriate capital structure. *New England Tel. & Tel. Co. v. Public Util. Comm'n*, 448 A.2d 272, 284 (Me.1982); *see also* Phillips, *The Regulation of Public Utilities*, pp. 345–346 (1984).

**3.** The Commission found that GWC had sold 14 out of its 19 subsidiaries in Maine over the past 11 years. In July of 1985 GWC also received approval to sell both the Ellsworth and Mechanic Falls Water Co. and was negotiating to sell the Millinocket Water Company at the time this rate case was being decided.

In reviewing the propriety of the method used for setting rate of return in this case, we begin by acknowledging that this Court traditionally defers to the Commission's expert judgment in choosing among various ratemaking techniques or methodologies. We will uphold the Commission's decision if the choice of method is reasonable and supported by substantial evidence. *New England Tel. & Tel. Co. v. Public Util. Comm'n*, 448 A.2d 272, 279 (Me.1982). *New England Tel. & Tel. Co. v. Public Util. Comm'n*, 470 A.2d 772, 776 (Me.1984). This deferential standard grows out of the understanding that

> Determining the cost of equity is one of the more difficult computations in the rate-making process. The Commission must concern itself with many economic variables and evaluate conflicting evidence interpreting and applying those variables.

*New England Tel. & Tel. Co. v. Public Util. Comm'n*, 448 A.2d at 287–88. We do not attempt to second-guess the Commission on matters falling within its realm of expertise. Cost of equity is one of the calculations that the Commission must make in order to determine a fair rate of return for the utility. *Central Maine Power Co. v. Public Util. Comm'n*, 455 A.2d 34, 38 (Me.1983). It represents what a utility must pay in order to attract financing from equity investors for its common or preferred stock, *New England Tel. & Tel. Co. v. Public Util. Comm'n*, 390 A.2d 8, 32 (Me.1978), and, as such, is the figure necessary to compensate investors for the risk assumed. *Federal Power Comm'n. v. Hope Natural Gas Co.*, 320 U.S. 591, 605, 64 S.Ct. 281, 289, 88 L.Ed. 333 (1944).

In *Mars Hill & Blaine Water Co. v. Public Util. Comm'n*, 397 A.2d 570, 585–87 (Me.1979), we approved use of the consolidated capital structure of the parent corporation for determining cost of equity when the utility being regulated is a wholly owned subsidiary without capital costs of its own. Under such a methodology, market evaluation of the parent's stock is thought to afford the primary evidence of the current cost of equity to the subsidiary. Phillips, *The Regulation of Public Utilities*, p. 352 (1984). Use of this approach allows the Commission to assume that the cost of the parent's common equity is the same as that of the utility being regulated. *See Legislative Util. Consumers' Council v. Granite State Electric Co.*, 119 N.H. 359, 402 A.2d 644, 648 (1979); *Ohio Suburban Water Co. v. Public Util. Comm'n*, 62 Ohio St.2d 17, 20; 402 N.E.2d 539, 541 (1980). Thus, the parent becomes the direct proxy for the subsidiary and the Commission's calculations are directed at measuring the parent's costs.

Consistent with the above authorities, the Commission in this case employed the consolidated capital structure of the Company's parent, GWC, to determine the cost of equity of Millinocket Water Company. Because GWC is also a wholly owned corporation without public stock to be evaluated, it was necessary to employ a comparable earnings approach to measure GWC's cost of equity by calculating the cost of equity for a sample of other similar utilities. The comparable earnings approach "is implemented by examining earnings on book common equity for enterprises that have comparable risks ..." Phillips at 361.

In applying the comparable earnings standard in this case, however, the Commission found that the Company's expert failed to examine utilities with similar risks to GWC because he eliminated from consideration all utilities that earn a substantial portion of their profits from the sale of utility property. In order to correct the expert's calculation and to reflect better the risk of investment in GWC, as proxy for the Company, the Commission simply determined the cost of equity of the sample group (12%) and then reduced this figure by 32.5%, the percentage of profit earned annually by GWC from the sale of utility property, to arrive at a figure of 8.1% as representative of GWC's, and thus the Company's cost of equity. Inasmuch

as the methodology applied by the Commission reasonably reflects the risk inherent in investing in GWC, and because GWC was the appropriate corporate level at which the Commission could direct its analysis, we affirm the Commission's decision on cost of equity as reasonable and supported by substantial evidence. .

The Commission's use of the above approach, moreover, does not violate the holding of *Maine Water Co. v. Public Util. Comm'n*, 482 A.2d 443 (Me.1984). In that case we struck down an attempt by the Commission to effect a dollar-for-dollar "flowthrough" of gains realized by Maine Water Company in selling its Newport & Wilton divisions. Unlike the present case, the Commission in *Maine Water Co.* offset rate increases that it otherwise would have allowed in order to permit ratepayers to recoup ninety percent of the Newport/Wilton gain. Id. at 447 n. 2. Here, the Commission attempted no "flow-through" but appropriately used the Company's parent as proxy for determining cost of equity. In calculating GWC's cost of equity, moreover, it was necessary to consider all factors that affect the price of GWC's stock. Inasmuch as a pattern of sizeable

profits from the sale of utility property reduced investors' risk and thus lowered GWC's cost of equity, the Commission was warranted in taking account of profit from such an activity. Such an approach does not amount to the type of "flow-through" disallowed in *Maine Water Co.*

## II. Rate Case Expenses

As a second issue on appeal, the Company argues that the Commission denied it reasonable rate case expenses in violation of 35 M.R.S.A. § 51 by awarding only $5,889 as a normal annual rate case expense. First, the Company maintains that Chapter 85, the new commission regulation governing rate case expenses, alters the standard for recovery of expenses on issues decided against it and consequently violates due process.[4] Second, the Company argues that Chapter 85 was arbitrarily applied in this case to reduce its allowable expenses.

■ It is a well-established maxim in utility regulation that the allowance of rate case expenses depends, as does the allowability of any other operating expenses, upon whether the expenses were prudently incurred. *Maine Water Co. v. Public Util. Comm'n*, 482 A.2d 443, 453 (Me.1984).

---

**4.** Chapter 85 provides in part:

    2. *Reports Required.*

    A. *Recovery of Expenses Sought in Same Proceeding*

    Each public utility seeking recovery of regulatory proceeding expenses shall, at the time of filing its main brief or at the time of the filing of stipulation resolving all issues, submit a report to the Commission containing a detailed description and accounting of all regulatory proceeding expenses. A supplement to this report shall be filed by the deadline set for the filing of exceptions to the examiner's report in litigated cases. Such reports shall identify the hours spent and fees charged by all persons whose salaries, fees or charges constitute regulatory proceeding expenses as defined in Section 1 above. *To the extent practicable* the report shall allocate regulatory expenses among the issues presented. (Emphasis added.)

    ....

    3. *Ratemaking Treatment.*

    A. No public utility shall recover from its ratepayers any regulatory proceeding expense, unless such expense has been found by the Commission to have been reasonable.

    B. With respect to recovery of regulatory expenses incurred in connection with proceedings initiated pursuant to 35 M.R.S.A. § 64, no public utility shall recover from its ratepayers any regulatory expense relating to issues decided against the utility unless the utility demonstrates that raising the issue served the public interest.

    ....

    D. In determining whether a regulatory proceeding expense is reasonable, the Commission shall use the following criteria: 1) the novelty and difficulty of the issues presented; 2) the customary fee in the community for similar services; 3) the amount of money at issue and the results obtained; 4) the extent to which the attorney's or expert's services contributed to the Commission's deliberation and decision of the proceeding; 5) whether the utility used a negotiations or bidding process when hiring outside attorneys and experts; and 6) the experience and ability of the attorney or expert. Other factors may be considered if relevant to a particular proceeding.

The prudence of any utility expenditure is tested with regard to both its purpose and amount, *Maine Water Co.*, 482 A.2d at 453, and a utility may not recover expenses "incurred in abortive or frivolous rate cases." *Stratton Water Co. v. Public Util. Comm'n*, 397 A.2d 188, 192 (Me.1979) (quoting *Re Carolina Water Co.*, 32 P.U. R.3d 462, 470 (N.C.U.C.1960)).

When scrutinized as a whole Chapter 85 appears to be an attempt by the Commission to filter out litigation of non-meritorious *issues* at the hearing stage of a rate case by compelling utilities to report expenses on an issue-by-issue basis where practicable. Application of this regulation affords the Commission the opportunity to determine not only if the entire rate case was reasonably and justifiably brought but also whether the separate issues litigated by the utility justified the expense incurred.

 Although Section 3(B) allows recovery of expenses for issues decided against the utility only when the utility demonstrates that raising the issue served the public interest, this standard appears to be little more than a restatement of the principle that a utility must demonstrate the justness and reasonableness of its expenses. *New England Tel. & Tel. Co. v. Public Util. Comm'n*, 448 A.2d 272 (Me. 1982). While the concept of "served the public interest" is not defined by the regulation, the entire thrust of expense justification in utility rate cases is centered on ensuring that the public is served by rate case litigation both in terms of keeping costs at a reasonable level and enabling a utility to operate as a viable business. Consequently, the determination of whether raising an issue ultimately decided against the utility served the public interest automatically involves a determination of what was reasonable in the particular case in light of the goals of keeping costs down and allowing the utility to recover reasonable expenses. Viewed in this light, Chapter 85 does not violate a utility's right to recover reasonable rate case expense.

Moreover, the Commission in this case did apply a reasonableness test to assess the Company's claimed expenses. This reasonableness test, moreover, was comprehensive, and the Commission's findings are supported by substantial evidence in the record. Accordingly, the Commission's decision to allow only $5,889 in annual expense is sustained.

The entry is:

Decision and Order and Supplemental Order of the Commission affirmed.

Judgment for Defendant on the Section 305 complaint.

All concurring.