**AMERICAN ASSOCIATION OF RETIRED PERSONS, et al.**

v.

**PUBLIC UTILITIES COMMISSION, et al.**

Supreme Judicial Court of Maine.

Argued Jan. 5, 1996.

Decided March 15, 1996.

Robert S. Frank (orally), Harvey & Frank, Portland, for AARP.

Mary Tousignant, Kimberlie J. Sweet, Student Attorney (orally), Portland, for Frederick Pease.

Joanne B. Steneck (orally), Public Utilities Commission, Augusta, for Appellee.

Gerald M. Amero, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, Donald Boecke (orally), Boston, MA, for NYNEX.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN and LIPEZ, JJ.

CLIFFORD, Justice.

The American Association of Retired Persons and Frederic Pease (AARP) appeal from the decisions of the Public Utilities Commission in a consolidated proceeding involving the Commission's investigations of the earnings and regulation of New England Telephone and Telegraph Company d/b/a NYNEX (NYNEX). AARP contends that the Commission erred in deciding that NYNEX may recover from ratepayers all of its investments in copper and fiber cables, as well as its digital switch costs; in determining NYNEX's cost of equity and its overall rate of return; and in awarding a portion of NYNEX's mandated rate reduction for use in libraries and schools.[1] We affirm the Commission's decisions.

■ In May 1994, pursuant to recently enacted legislation,[2] the Commission initiated an investigation (the AFOR investigation) regarding whether an alternative form of regulation of NYNEX ought to be established. The purpose of the proceeding was to create a regulatory structure that would "give NYNEX flexibility to operate in a competitive telecommunications environment, while preserving and enhancing protection of basic ratepayers." In July 1994, Frederic Pease and twelve other Maine citizens filed a complaint with the Commission against NYNEX requesting an investigation of the utility's level of earnings. The complaint asserts, *inter alia*, that NYNEX's telephone rates are disproportionately high compared to other regions of the country, and that such rates are due in part to NYNEX's investments in high-technology services. The petitioners asked the Commission to investigate whether some of NYNEX's investments in fiber-optic and high-speed data facilities should be excluded from its rate base.[3]

The Commission sustained the complaint and ordered an investigation (the earnings investigation) regarding whether any of NYNEX's cable and switch investments may be included in its local and toll service rate bases. The Commission ordered the consolidation of the AFOR and earnings investigations. Twenty parties were permitted to intervene in the consolidated proceeding, including the Maine State Legislative Committee of the AARP, the Office of the Public Advocate, and the Maine Library Association.

---

1. Although the parties are referred to collectively as "AARP" throughout this opinion, Pease alone contests the Commission's decision to award a portion of the rate reduction for use in libraries and schools. *See infra* Part IV.

2. P.L.1993, ch. 638, § 2 (effective July 14, 1994), "An Act to Establish an Alternative Form of Telecommunications Regulation in the State," authorizes the Commission to adopt an "alternative form of regulation for any telephone utility in [Maine]."

3. "Rate base" is the value of a utility's investment on which it is allowed to earn a return. It is established by fixing a reasonable value on all property of a public utility that is used or required to be used in its service to the public within the State. 35-A M.R.S.A. § 303 (Supp. 1995); *cf. Camden & Rockland Water Co. v. Public Util. Comm'n*, 432 A.2d 1284, 1286 (Me. 1981).

Hearings were conducted by the Commission from February 7–16, 1995. Various experts testified concerning NYNEX's network modernization program. AARP argued that because portions of NYNEX's infrastructure are neither "used" nor "useful,"[4] the Commission should deduct the annual depreciation and operational charges associated with the infrastructure from NYNEX's revenue requirements. Although it conceded that portions of its fiber-optic cabling are not currently in use, as well as the existence of excess capacity in its network, NYNEX disputed the methodology and conclusions of the AARP's experts. The Commission determined that NYNEX was entitled to charge ratepayers for the costs of its cabling investments unless it was shown that such investments were not "prudently incurred." The Commission stated: "[W]e have never adopted a policy under which we would disallow a plant solely because it was not used and useful. . . ."

The Commission decided against a recommendation by its staff to reduce NYNEX's revenue requirements in light of the excessive costs paid by NYNEX for its digital switches "without a stronger evidentiary basis for the amount of switching costs that are unreasonable." The Commission invited parties to submit "more particularized evidence" on this issue and to "petition[ ] the Commission to investigate this matter further."

 The Commission also rejected a suggestion from its staff that in considering the rate of return on NYNEX's investments when computing its revenue requirements, it ought to consider the fact that NYNEX's equity is held entirely by its parent corporation, and that the parent corporation's lower cost of capital should be factored into the computation of NYNEX's cost of equity. This argument is based on the double leveraging method. *See New England Tel. & Tel. Co. v. Public Util. Comm'n*, 448 A.2d 272, 284–88 (Me.1982) (discussion of double leveraging method).[5] The Commission declined to use the double leveraging method and determined that NYNEX's rate of return should be set at 10.44%, rejecting the staff's recommendation that it be set at 9.63%. In setting the rate of return, the Commission considered the potential future effects on NYNEX of the newly-adopted alternative regulation plan.

On May 15, 1995, the Commission issued the final reports in both investigations. In the earnings investigation, the Commission concluded that NYNEX must file rates to decrease its intrastate revenues by $10.446 million. The Commission also ordered NYNEX to devise a plan pursuant to which up to $4 million per year over the next five years in rate reductions or other benefits would be used for technological improvements in Maine's libraries and schools.[6] NYNEX also was ordered to issue a one-time credit to all customers in the amount of $2.8 million.

In the AFOR investigation, the Commission adopted an alternative form of regu-

---

**4.** 35–A M.R.S.A. § 303, the statute governing the valuation of property for ratemaking, provides in pertinent part:

> In determining just and reasonable rates, tolls and charges, the [C]ommission shall fix a reasonable value upon all the property of a public utility . . . which is *used or required to be used* in its service to the public within the State and a fair return on that property.
>
> (Emphasis added.)

**5.** Double leveraging describes a "situation where the equity capital of the subsidiary is funded by the combination of both debt and equity in the capital structure of the parent corporation. Unless some adjustments are made, the utility may earn a higher rate of return than it actually costs to secure equity capital." *New England Tel. & Tel. Co. v. Public Util. Comm'n*, 448 A.2d 272,

285 (Me.1982). Such adjustments made by the Commission attempt to account for a parent corporation's use of its low-cost debt to purchase stock in its subsidiary, by which it may earn a higher rate of return than it pays for the debt. *See New England Tel. & Tel. Co. v. Public Util. Comm'n*, 390 A.2d 8, 41 (Me.1978).

**6.** This decision is challenged solely by Pease on appeal. We find no merit in Pease's additional contention that *ex parte* communications by NYNEX and others with the Commission on this matter taints the decision. In August 1995, the Commission began a separate investigation into the allegation of improper *ex parte* communications by NYNEX. Although it did not find that the utility had violated any of its rules, the Commission did issue a notice of rulemaking proposing certain changes and clarifications regarding such communications.

lation to govern NYNEX's intrastate operations for the next five years, with the possible extension of the plan for another five years. The AFOR includes a price cap structure and pricing rule that will apply to all of NYNEX's "core services." AARP filed a petition for reconsideration of the two orders. The petition was denied by operation of law after the Commission failed to act on it within the required twenty-day period. AARP and Pease filed notices of appeal from this decision.

 Our review of a Commission decision is limited. We review only questions of law, and accept the Commission's findings of fact as final if they are supported by substantial evidence on the record. *Public Advocate v. Public Util. Comm'n,* 655 A.2d 1251, 1253 (Me.1995). We defer to the Commission's choice of ratemaking methodologies or techniques. *Id.* "Only when the Commission abuses the discretion entrusted to it, or fails to follow the mandate of the legislature, or to be bound by the prohibitions of the constitution, can this court intervene." *New England Tel. & Tel. Co. v. Public Util. Comm'n,* 148 Me. 374, 377, 94 A.2d 801 (1953).

### I.

 AARP contends that utility property must be "used or required to be used" pursuant to 35–A M.R.S.A. § 303 (Supp.1995) to qualify for inclusion in the rate base, and that because NYNEX has portions of "stranded" copper cabling[7] and new fiber-optic cabling not in use, its value should be excluded from the rate base. The Commission determined that section 303 allows for the recovery of the copper cables that *were* used or useful, even though they now may have become partially obsolete due to new technology.

AARP's contention with respect to the outdated copper wire and not-yet-fully-used fiber wire is similar to an argument rejected by us in *Central Maine Power Co. v. Public Util. Comm'n,* 433 A.2d 331 (Me.1981). In that case, we upheld the Commission's decision to allow the inclusion in the utility's rate base the value of land purchased for future use, but only if a definite plan existed for the land's anticipated use.[8] We agreed with the Commission that the former statutory version of current section 303 did not by its "used or required to be used" language require the inclusion *only* of property that is currently used and useful in service of the public. *Id.* at 350. We rejected the argument that until property is used and useful in providing electricity, shareholders alone should bear the burden of its acquisition, noting that "if this had been the legislature's intent, there would have been no need for use of the disjunctive 'or' in the phrase 'used or required to be used.'" *Id.* (citation omitted).

By agreeing with the Commission's argument that land held for future use may in certain instances be included in the rate base, we recognized "the need of utilities to acquire property in advance of its in-service date and the need of ratepayers to pay a return only on that property from which they have a reasonable guarantee of receiving service." *Id.* at 351. This rationale is equally applicable to the investments, both for past and future needs, made by NYNEX in the instant case and found by the Commission to have been prudently made. We agree with the Commission that were we to adopt the position advanced by AARP on this matter, it could lead to a public policy creating disincentives for utilities to develop new technologies. A regulated company may choose not to deploy cost-effective technologies if it is not allowed recovery of prudently invested, in-place facilities that are made obsolete by newer technology.

 Likewise, AARP's contention that the Commission erred in employing a "prudently

---

7. "Stranded" cabling refers to embedded plant that has been made obsolete or redundant by new cabling.

8. In upholding the Commission's "definite plan standard" for determining when utility property held for future use may be allowed in the rate base in *Central Maine Power Co. v. Public Util.* *Comm'n,* 433 A.2d 331, 341 (Me.1981), we determined that the standard provided a "rational compromise between automatically including and automatically excluding all property held for future use and, more importantly, as a workable interpretation of the statutory concept 'property ... required to be used'...."

made" investment test in deciding to allow recovery of NYNEX's investments in the cabling is without merit. *See, e.g., Millinocket Water Co. v. Public Util. Comm'n,* 515 A.2d 749, 753 (Me.1986) (allowance of operating expenses depends on whether expenses prudently incurred).

## II.

■ We are unpersuaded by AARP's next contention that the Commission erred by failing to determine what portion of NYNEX's investment in digital switches was excessive, and that the burden of proof for justifying the recovery of this expense was not properly placed on NYNEX.

The Commission staff, based on comparable costs of digital switches in other states, recommended an adjustment reducing the rate base investment on NYNEX's costs in acquiring digital switches by approximately $7.9 million. Although the Commission found the staff's evidence to be "essentially unrebutted" by NYNEX, it declined to adjust the rate base for want of a "stronger evidentiary basis" on the question of unreasonable switch costs. The Commission invited the parties to offer more specific evidence in a future proceeding.

We have noted previously that the Commission has "the duty to decide whether a utility has met its burden of justifying its recovery of a particular expense from ratepayers." *Pine Tree Tel. & Tel. Co. v. Public Util. Comm'n,* 634 A.2d 1302, 1306 (Me.1993) (citation omitted). The record discloses that the evidence before the Commission on this issue was limited to the actual switch costs provided by NYNEX and the testimony of the staff and its expert witness, David Gabel, who compared switch costs in Maine with those of other states. The Commission found that NYNEX's evidence of the actual costs of the switches was the best evidence before it, and allowed NYNEX to include such costs in its rates. This determination

was supported by substantial evidence in the record, notwithstanding AARP's contention regarding the burden of proof. *See Pine Tree Tel. & Tel. Co. v. Public Util. Comm'n,* 631 A.2d 57, 62 (Me.1993) (where substantial evidence exists in record to support decision, Law Court need not consider allocation of burden of proof below).

The Commission had discretion to reject the testimony of an expert witness, Gabel, despite NYNEX's limited response to his assertions. *Mars Hill & Blaine Water Co. v. Public Util. Comm'n,* 397 A.2d 570, 585 (Me. 1979). The Commission independently determined, as required by law, the amount of NYNEX's digital switch costs, *Public Advocate,* 655 A.2d at 1253, and properly kept the burden of proof on NYNEX. 35-A M.R.S.A. § 1314(1) (1988).

## III.

### A.

■ AARP contends that the Commission erred in setting a rate of return for NYNEX that did not reflect its true cost of equity.[9] AARP argues that because NYNEX's stock is owned by a parent company that finances its investment with its own stock and debt, a double leveraging adjustment should have been made by the Commission in determining the true cost of equity.[10] We disagree. The Commission's cost of equity and rate of return determinations are supported by substantial evidence, and it was within the Commission's discretion whether to apply a double leveraging method in establishing NYNEX's rate of return.

■ As noted above, we accord great deference to the Commission's choice of ratemaking methodologies or techniques. An objective of the Commission in a rate proceeding should be "to achieve a proper balance between the right of the utility's investors to earn a fair return on their investment and the right of the ratepayers to a fair charge

---

9. The cost of equity, which represents what a utility must pay in order to attract financing from equity investors for its common or preferred stock, is a figure necessary to compensate investors for the risks they have assumed. It is one of the calculations the Commission must make in

order to determine a fair rate of return for the utility. *Millinocket Water Co. v. Public Util. Comm'n,* 515 A.2d 749, 751 & n. 2 (Me.1986).

10. *See supra* note 4.

based on the value of the services provided by the utility." *New England Tel. & Tel. Co.*, 448 A.2d at 288 (citation omitted). In addition, "[t]he return on investment calculated by the Commission must not be so unreasonably low as to be confiscatory." *Id.* (citations omitted).

At the hearing, the Commission staff estimated NYNEX's cost of equity to be in the range of 11.25% to 12.25%, and its rate of return to be 9.63%. The Commission ultimately decided on a cost of equity of 12.25% and a rate of return of 10.44%. Although NYNEX is a wholly-owned subsidiary of NYNEX Corp., the Commission determined that its capital structure was reasonable and that there was no need to impose a double leveraging adjustment in calculating NYNEX's rate of return. The Commission instead employed a divisional cost of capital approach. Although some witnesses recommended that the Commission consider the effects of a double leveraging adjustment, none expressly advocated that such an adjustment be made in this case.

The cost of capital established by the Commission is reasonable and is based on substantial evidence in the record. The Commission specifically denoted why it did not use a double leveraging method in this case. The Commission also gave notice of its decision to employ a divisional cost of capital approach in the future unless there is evidence to suggest that a utility's corporate structure is unreasonable. In addition, the Commission was entitled to allow an adjustment to NYNEX's cost of equity to account for its issuance costs. *Mars Hill & Blaine Water Co.*, 397 A.2d at 587.

## B.

■ AARP also contends that the Commission relied on an impermissible factor, the risks faced by NYNEX under the newly-adopted alternative form of regulation, in setting a rate of return. In particular, AARP points to the Commission's language used in determining NYNEX's cost of equity:

> [NYNEX] will bear increased risk under an Alternative Form of Regulation (AFOR) Plan. We believe that it is important to recognize the changing risk profile for the Company under an AFOR plan. Under an AFOR Plan, we must allow the Company a return on equity that is reasonably consistent with the Company's current and prospective financial and business risk.

AARP argues that the Commission should have compared the rates that ratepayers were projected to pay under the AFOR plan with the rates they would have paid under traditional rate of return regulation, without regard to any increased risks created by the AFOR plan.

We have stated previously that we will "not disturb the Commission's *result* so long as the cost of equity allowed is within a range of reasonableness supported by sufficient evidence." *Central Maine Power Co. v. Public Util. Comm'n*, 455 A.2d 34, 39 (Me.1983) (emphasis in original). AARP argues that because the statute authorizing the Commission to adopt an alternative form of regulation requires that it first determine that ratepayers would be no worse off under an AFOR than under a traditional rate of return regulation, 35–A M.R.S.A. § 9103(1),[11] the Commission cannot also consider the risks associated with an AFOR itself in setting NYNEX's cost of equity.

■ The Commission properly considered all of the evidence before it, including the potential risks facing NYNEX, in arriving at a figure admittedly toward the high end of the staff's suggested ranges of cost of equity and rate of return. The language of section 9103(1), however, does not forbid the Commission from considering potentially

---

11. The statute provides in pertinent part that "[u]nless the Commission specifically finds that the following objectives are not in the best interests of ratepayers, the [C]ommission shall ensure that any alternative form of regulation it adopts ... is consistent with the following [nine] objectives." 35–A M.R.S.A. § 9103. In its appeal, AARP focuses on the first of these objectives, that "ratepayers as a whole, and residential and small business ratepayers in particular, may not be required to pay more for local telephone services as a result of the implementation of an alternative form of regulation than they would under traditional rate-base or rate-of-return regulation." *Id.* § 9103(1).

greater business risks in ascertaining a utility's reasonable rate of return. Under the adopted AFOR, NYNEX is forbidden, for example, from requesting general rate relief for the next five years. Higher equity costs thus were deemed offset by savings in other areas by the Commission. The statute requires only that rates paid by customers under the AFOR be no higher than they would be pursuant to the traditional rate of return regulation.[12] The Commission's decision on this matter was made pursuant to a proper exercise of its discretion.

## IV.

Last, Pease contends that the Commission was without proper record or statutory authority to order that $4 million per year of the mandated rate reduction be allocated to libraries and schools over the next five years. Because Pease failed, however, to timely denominate it as a ground for appeal in his original notice of appeal, this issue was not preserved for review. 35–A M.R.S.A. § 1320(4); *Mars Hill & Blaine Water Co.*, 397 A.2d at 587.

The entry is:

Judgment affirmed.

All concurring.

---

**12.** Section 9103(6) also requires that under an alternative form of regulation, the Commission "must ensure that the telephone utility has ... a reasonable opportunity to earn a fair return on the investment necessary to provide local telephone services."