PINE TREE TELEPHONE &
TELEGRAPH COMPANY,
et al.

v.

PUBLIC UTILITIES COMMISSION.

Supreme Judicial Court of Maine.

Argued March 17, 1993.
Decided Aug. 23, 1993.

Joel C. Martin (orally), Petruccelli & Martin, Portland, for plaintiffs.

James A. Buckley, Glen S. Goodnough (orally), Public Utilities Commission, Augusta, for defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, COLLINS, RUDMAN and DANA, JJ.

COLLINS, Justice.

Pine Tree Telephone and Telegraph Company appeals from a Public Utilities Commission (the commission) decision requiring Pine Tree to reduce its revenues by $720,910. Pine Tree challenges the commission's decision to the extent that it: (1) allocates the burden of proof to Pine Tree; (2) uses a residual ratemaking methodology; (3) includes revenues and expenses from Pine Tree's interstate billing and collections activities in Pine Tree's total revenues and expenses; (4) adopts a hypothetical capital structure without first finding that Pine Tree's rates were unreasonable; (5) uses the average cost of imbedded debt for other Maine independent telephone companies when Pine Tree had no historical debt; and (6) finds Pine Tree's president's total compensation was unreasonable when it found his base salary and Pine Tree's bonus structure were both reasonable individually. We affirm the commission's decision.

Pine Tree Telephone and Telegraph Company is a small independent telephone company serving the communities of Gray, West Gray, and New Gloucester. In May 1990, 12 Pine Tree customers requested, pursuant to 35–A M.R.S.A. § 1302 (1988),[1] that the commission investigate Pine Tree's

1. 35–A M.R.S.A. § 1302 (1988) provides:

**1. Filing a complaint.** When a written complaint is made against a public utility by 10 persons aggrieved that the rates, tolls, charges, schedules or joint rate or rates of a public utility are in any respect unreasonable or unjustly discriminatory; that a regulation, measurement, practice or act of a public utility is in any respect unreasonable, insufficient or unjustly discriminatory; or that a service is inadequate or cannot be obtained, the commission, being satisfied that the petitioners are responsible, shall, with or without notice, investigate the complaint.

\* \* \* \* \* \*

**3. Complaint by utility or commission.** The commission may institute or any public utility may make complaint as to any matter affecting its own product, service or charges....

rates, revenues, and management policies to determine whether Pine Tree was: (1) earning more than a reasonable rate of return; (2) overcompensating its executives; and (3) meeting its requirements in the Lifeline and Link–Up programs.[2] After an informal investigation, the commission's staff recommended further investigation into the matters raised in the customer-initiated complaint. The commission agreed and decided to close the initial customer complaint and open its own investigation pursuant to 35–A M.R.S.A. § 1303 (1988).[3] As a result of this investigation, the commission required Pine Tree to reduce its revenues by $720,910 and use these excess revenues to "terminat[e] touch call and mileage charges, [expand] Pine Tree's two-way local calling area and, with any remaining revenue, [provide] enhanced toll discounts to certain non-contiguous calling areas." Pine Tree appeals.

## I.

### Standard of Review and Burden of Proof

 We have held that the commission and not this court is the judge of the facts and its determinations of fact are final provided they are supported by substantial evidence in the record.[4] *New England Tel. & Tel. Co. v. Public Util. Comm'n* 448 A.2d 272, 278 (Me.1982) (hereinafter *NET 1982*) (citing *Central Maine Power Co. v. Public Util. Comm'n*, 414 A.2d 1217, 1232 (Me.1980)). Our review is limited to questions of law. *NET 1982* at 279. As we have said before, "[o]nly when the Commission abuses the discretion entrusted to it, or fails to follow the mandate of the legislature, or to be bound by the prohibitions of the constitution, can this court intervene." *NET 1982*, 448 A.2d at 279 (quoting *New England Tel. & Tel. Co. v. Public Util. Comm'n*, 148 Me. 374, 94 A.2d 801, 803 (1953) (hereinafter *NET 1953*)). We are particularly reluctant to substitute our judgment for that of the commission because of the institutional deference we pay to its expertise; we are not a super-commission. *See NET 1982*, 448 A.2d at 279. On the other hand, we have not hesitated to act when the commission has "transgressed its functions and has gone beyond the limit of what it was authorized to do" because such questions raise "fundamental issue[s] of law." *NET 1953*, 94 A.2d at 809.

 Pine Tree asserts that the commission committed clear error by allocating the burden of proof to Pine Tree rather than to the customer-complainants or the commission's staff. Pine Tree asserts that it is not a "party adverse to the commission" according to the terms of 35–A M.R.S.A. § 1314 (1988)[5] because it was acting under

---

2. In September 1991, a second complaint signed by 48 Pine Tree customers was added to the May 1990 complaint. The second complaint requested that Pine Tree offer toll-free calling from the New Gloucester exchange to the Lewiston–Auburn area.

3. 35–A M.R.S.A. § 1303 provides:
 **1. Summary investigations.** The commission may on its own motion, with or without notice, summarily investigate when it believes that:
 **A.** A rate or charge is unjust or unreasonable;
 **B.** A service is inadequate or cannot be obtained; or
 **C.** An investigation of any matter relating to a public utility should for any reason be made.
 **2. Formal investigation.** If after the summary investigation, the commission is satisfied that sufficient grounds exist to warrant a formal public hearing as to the matters investigated, it shall give the interested public utility written notice of the matter under investigation. . . .

4. We have held that the "substantial evidence in the record" standard is identical to the "clear error" standard. *Gulick v. Board of Envtl. Protection*, 452 A.2d 1202, 1207–08 (Me.1982). A factual finding is clearly erroneous only if there is no competent evidence in the record to support it. *Hamm v. Hamm*, 584 A.2d 59, 62 (Me. 1990).

5. The allocation of the burden of proof in proceedings before the commission is made according to 35–A M.R.S.A. § 1314 (1988) which provides:
 **1. Party adverse to the commission.** In all trials, actions and proceedings arising under this Title or growing out of the exercise of the authority granted to the commission, the burden of proof is on the party adverse to the commission or seeking to set aside any determination, requirement, direction or order of

a tariff approved by the commission in 1987. Because we find there is substantial evidence in the record to support the Commission's decision, we need not consider this assertion. *See Central Maine Power v. Public Util. Comm'n*, 414 A.2d at 1236 n. 10 ("Since we decide that the Commission's ... Orders were supported by sufficient evidence affirmatively of record, we have no occasion to be embroiled in the controversy among the parties as to who may have borne either the burden of coming forward with evidence or the ultimate burden of proof.").

## II.

### *Jurisdictional Separations*

#### A. *Background*

■ The Communications Act, enacted by Congress in 1934, gave the Federal Communications Commission (the FCC) authority to regulate "interstate and foreign commerce in wire and radio communication," 47 U.S.C. § 151 (1991); while expressly denying the FCC jurisdiction "with respect to ... intrastate communications service." 47 U.S.C. § 152(b) (1991); *see also Louisiana Public Service Comm'n v. FCC*, 476 U.S. 355, 360, 106 S.Ct. 1890, 1894, 90 L.Ed.2d 369 (1986). Authority to regulate intrastate services remained with the several states. *Crockett Tel. Co. v. FCC*, 963 F.2d 1564, 1566 (D.C.Cir.1992); *see also* 47 U.S.C. § 221(b) (1991). To implement this scheme of dual regulation, a utility's "revenues, investment, and expenses must be apportioned between the interstate and intrastate jurisdictions." *Mid–Plains Tel. Co.*, 5 F.C.C.R. 7050, 7050 (1990), *aff'd sub nom., Crockett Tel. Co. v. FCC*, 963 F.2d 1564 (D.C.Cir.1992). This process of apportionment is known as "jurisdictional separation." *Crockett Tel. Co. v. FCC*, 963 F.2d at 1566. Congress authorized the FCC to determine what property of a telephone company is used to provide interstate services. 47 U.S.C. §§ 221(c) (1991).

■ "However, while the [Communications] Act would seem to divide the world of domestic telephone service neatly into two hemispheres—one comprised of interstate service, over which the FCC would have plenary authority, and the other made up of intrastate service, over which the States would retain exclusive jurisdiction—in practice, the realities of technology and economics belie such a clean parceling of responsibility." *Louisiana Public Service Comm'n v. FCC*, 476 U.S. at 360, 106 S.Ct. at 1894. In reality, virtually all of the telephone equipment and plant used to provide intrastate service is also used to provide interstate services. *Id.* Despite the difficulties with which the separations process is fraught, "[t]he separation of the intrastate and interstate property, revenues and expenses of the company is important not simply as a theoretical allocation ... [i]t is essential to the appropriate recognition of the competent governmental authority in each field of regulation." *Smith v. Illinois Bell Tel. Co.*, 282 U.S. 133, 148, 51 S.Ct. 65, 68, 75 L.Ed. 255 (1930). "Failure by the Commission to make properly such jurisdictional separations may constitute reversible error," *NET 1982*, 448 A.2d at 298 (reversing commission's allocation of foreign exchange plant costs to the interstate jurisdiction contrary to the FCC's practice); but "because of 'the difficulty in making an exact apportionment of the property ... extreme nicety is not required.'" *Crockett Tel. Co. v. FCC*, 963 F.2d at 1566 (quoting *Smith v. Illinois Bell*, 282 U.S. at 150, 51 S.Ct. at 69).

### B. *The Development of Average Schedules*

Prior to divestiture,[6] the FCC did not adopt a formal jurisdictional separations

the commission complained of as unreasonable, unjust or unlawful.

 **2. Public utilities.** In all original proceedings before the commission where an increase in rates, tolls, charges, schedules or joint rate is complained of, the burden of proof is on

the public utility to show that the increase is just and reasonable.

**6.** In 1982, the United States District Court for the District of Columbia ordered the "divestiture of the [Bell] Operating Companies from the

procedure. *Mid–Plains Tel. Co.,* 5 F.C.C.R. at 7050. Instead, the FCC allowed AT & T to use a cost allocation plan outlined in the *Separations Manual,* issued by the National Association of Regulatory Utility Commissioners (NARUC) in 1974, to determine each associated Bell Operating Company's costs of providing interstate service. *Id.* In 1983, the FCC codified the cost-based approach outlined in the *Separations Manual* as Part 36 of its rules, 47 C.F.R. §§ 36.1–36.741 (1992). *Id.* The FCC allowed AT & T to distribute its revenues to the smaller independent telephone companies, not by the *Separations Manual,* but instead by a system of "settlements" based on negotiated formulas which eventually became known as "average schedules." *Mid–Plains Tel. Co.,* 5 F.C.C.R. at 7050. These average schedules adopted "generalized industry data to reflect the cost of a hypothetical exchange company." *National Assoc. of Regulatory Util. Comm'nrs v. FCC,* 737 F.2d 1095, 1127 (D.C.Cir.1984), *cert. denied,* 469 U.S. 1227, 105 S.Ct. 1224, 84 L.Ed.2d 364 (1985) (hereinafter *NARUC v. FCC* ).

After divestiture and the codification of the *Separations Manual,* the FCC continued to allow small independent telephone companies, including Pine Tree, to "estimate some or all of their costs through use of an 'average schedule.' " *Id.* The FCC's purpose in continuing the existing "average schedule" system was "to avoid imposing the burden of developing cost information upon companies that may be too small to meet that burden." [7] *Mid–Plains Tel. Co.,* 5 F.C.C.R. at 7051; *see also Separations of Costs of Regulated Tel. Service from Costs of Nonregulated Activities,* 2 F.C.C.R. 6283, 6316 n. 218 (1987) ("Use of

an average schedule eliminates the necessity of conducting expensive and burdensome cost studies.").

## C. Residual Ratemaking

The FCC's average schedules, like its Part 36 cost-based separations method, label a certain portion of a telephone company's costs as interstate costs. Therefore, some state regulators simply subtract these interstate costs from the company's total costs and treat the residuum as intrastate costs. *Crockett,* 963 F.2d at 1567. This intrastate ratemaking method is known as "residual" or "total company" ratemaking. *Id.* The residual ratemaking process, in the context of an average schedule company, has been described as follows:

> [First] the commission determines a reasonable level of expense and a reasonable return on the net investment rate base for the total company. The commission then deducts the amount of average schedule payments from the total company revenue requirement to determine the intrastate portion of the total company revenue requirement. Intrastate rates are then established to recover this residual amount.

*Peoples Tel. Co.,* 100 P.U.R.4th 272, 275–76 (Wisc.P.S.C.1989). In other words, state regulators using residual ratemaking assume that the intrastate revenue requirement is equal to the company's total revenue requirement less revenues deemed by the average schedules to be interstate. *Id.*

█ In the case at bar, Pine Tree attempted to use a jurisdictional cost-separations study to calculate its intrastate revenue requirement.[8] The commission reject-

---

remainder of AT & T." *United States v. American Tel. & Tel. Co.,* 552 F.Supp. 131, 160, 170 (D.D.C.1982), *aff'd mem.,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983), *modified,* 714 F.Supp. 1 (1988), *cert. denied,* 498 U.S. 911, 111 S.Ct. 283, 112 L.Ed.2d 238 (1990).

7. Pine Tree also points to assertions by the FCC that:

> Under the average schedule formulas, average schedule companies retain the benefits that accrue from increases in productivity and re-

ductions in expenditures, and therefore, like price cap carriers, have economic incentives to operate as efficiently as possible.

*Policy and Rules Concerning Rates for Dominant Carriers,* 5 F.C.C.R. 6786, 6820 (1990).

8. A company's "revenue requirement" is the "total amount that a carrier is entitled to charge for services." *Louisiana Public Service Comm'n v. FCC,* 476 U.S. at 365, 106 S.Ct. at 1896. It is the "sum of [the carrier's] current operating expenses, including taxes and depreciation ex-

ed that approach and decided to use residual ratemaking, holding:

> Pine Tree's interstate cost allocation is determined by the amount of revenue it receives pursuant to its interstate average schedules. This amount is then deducted from the Company's total revenue requirement to determine its intrastate revenue requirement.

The commission reasoned that using residual ratemaking "will guarantee 100% recovery, no more, no less." [9]

■ Pine Tree first argues that the commission's approach violates the Supremacy Clause of the United States Constitution. *See* U.S. Const. art. VI. The Supremacy Clause provides Congress and federal agencies, acting within the scope of their congressionally delegated authority, the power to preempt state regulation. *Louisiana Public Service Comm'n v. FCC*, 476 U.S. at 368–69, 106 S.Ct. at 1898–99. The FCC has specifically declined to preempt the use, by State regulators, of residual ratemaking with average schedule companies. *See Mid–Plains Tel. Co.*, 5

F.C.C.R. at 7054 (holding that "[state regulator's] use of residual ratemaking for determining a telephone company's intrastate revenue requirements does not contravene the Communications Act or any rule of this Commission."). The Court of Appeals for the District of Columbia Circuit affirmed the FCC's decision, concluding:

> [Use of an] average schedule interstate cost calculation, in conjunction with residual intrastate calculation, does not violate the Communications Act. The power of the state to employ the residual method is not preempted by federal regulation.

*Crockett*, 963 F.2d at 1574. We, therefore, reject Pine Tree's assertion that the commission's use of a residual ratemaking methodology violated the Supremacy Clause.

■ Second, Pine Tree asserts that the commission's use of residual ratemaking results in an unconstitutional taking because the commission's actions "take revenue earned from Federal operations and

penses, and a return on its investment 'rate base.'" *Id.*

**9.** The Commission's concerns can be more easily explained by reference to a hypothetical example given by the D.C. Circuit Court of Appeals in *Crockett*, 963 F.2d at 1568–69, which reads as follows:

*Situation 1: Pure Cost Method*

Suppose [Pine Tree] has total costs of $100; it has a right to recover these costs in rates set by appropriate authorities. It conducts a Part 36 cost study [pursuant to 47 C.F.R. §§ 36.1–36.741 (1992)] annually and ascertains that $25 of the $100 is due to interstate service, and, consequently, $75 to intrastate service. It is entitled to receive those sums from the appropriate customers under rates set by governmental authorities. There is no dispute. In sum:

| | |
|---|---|
| Total Costs | $100 |
| Interstate Costs | $ 25 |
| *Intrastate Costs* | $ 75 |
| Total Allowed | $100 |

\* \* \* \* \* \*

*Situation 2: Pure Averaging*

Now suppose that [Pine Tree] chooses to go on the average schedule system for obtaining its interstate payments. Its true costs are still the same as above. Yet, suppose the average schedule allows $35 for interstate service.

Residual ratemaking by the states would simply take [Pine Tree's] total costs ($100) and subtract the amount recovered from the average schedule ($35) and, thus, allow [Pine Tree] to recover $65 in intrastate charges.

| | |
|---|---|
| Total Costs | $100 |
| Interstate Average | $ 35 |
| *Residual Costs* | $ 65 |
| Total Allowed | $100 |

\* \* \* \* \* \*

*Situation 3: Mixing Average Schedules and Cost Methods [Pine Tree's Preferred Approach]*

[Pine Tree] seeks to use the average schedule on the federal level while employing the cost method on the state level allowing [Pine Tree] more cost basis in total ratemaking than its actual costs:

| | |
|---|---|
| Total Costs | $100 |
| Interstate Average [determined via an average schedule] | $ 35 |
| [Actual] Intrastate Costs [determined via a Part 36\* cost study] | $ 75 |
| Total Allowed | $110 |

Thus ... allow[ing] ... a carrier [to use] the average schedule to calculate costs of interstate service but determining actual costs for intrastate ratemaking ... [could provide the utility] with a total base for rate calculation exceeding 100% of its costs.
[\* 47 C.F.R. §§ 36.1–36.741 (1992) ]
*Id.*

use that money to subsidize State callers." In support of its position, Pine Tree points in particular to the commission's application of an overall rate of return of 10.586% to Pine Tree's interstate as well as its intrastate revenues.[10] Pine Tree asserts that this, at the very least, deprives the company of the interstate return requirement of 12%.[11] The commission apparently decided not to adjust Pine Tree's rate of return to reflect any differences in the interstate and intrastate return requirement.

Pine Tree correctly points out that the United States Supreme Court has analyzed regulatory action under the takings clause of the Fifth and Fourteenth Amendments. *See Duquesne Light Co. v. Barasch*, 488 U.S. 299, 306–10, 109 S.Ct. 609, 615–17, 102 L.Ed.2d 646 (1989) (upholding state statute excluding utility plant not yet in use from a utility's rate base finding no unconstitutional taking of utility's property). The Court held that "the Constitution protects utilities from being limited to a charge for their property ... which is so 'unjust' as to be confiscatory." *Id.* 488 U.S. at 307, 109 S.Ct. at 615. The Court continued, "[i]f the rate [set by the Commission] does not afford sufficient compensation, the State has taken the use of utility property without paying just compensation and so violated the Fifth and Fourteenth Amendments." *Id.* 488 U.S. at 308, 109 S.Ct. at 616. Because Pine Tree does not argue that the rates set by the commission are confiscatory, but instead argues that the commission is subsidizing intrastate activities with revenues from interstate activities, its challenge to the commission's setting an overall rate of return is also better analyzed as a federal preemption question as was the commission's decision to use residual ratemaking in general.

In its order upholding the use of residual ratemaking for average schedule companies, the FCC implicitly allowed State regulators to apply an overall rate of return even if that rate of return differs from the federal rate. In that proceeding, Mid–Plains Telephone Company challenged an order by the Wisconsin Public Service Commission in which the Wisconsin Commission, using residual ratemaking, applied an overall rate of return different from the federal rate. *Mid–Plains Tel. Inc.*, No. 3650–DR–100, 3650–TR–100, 3650–TI–101, slip op. at 14, 18 (Wisc.P.S.C.1989). The FCC concluded that the Wisconsin Commission's "use of residual ratemaking does not contravene the Communications Act or any rule of [the FCC]," *Mid–Plains Tel. Co.*, 5 F.C.C.R. at 7054. This conclusion demonstrates the FCC's implicit approval of the Wisconsin Commission's use of an overall rate of return. Moreover, if Pine Tree had wanted to ensure that it recovered the federal rate of return, it could have elected to follow the cost-based separations method of Part 36 rather than the average schedule approach.

We also reject Pine Tree's contention that the commission's decision improperly deprives the company of "incentive earnings from the Federal average schedule method." The FCC has stated that the economic incentive of "retain[ing] the benefits that accrue from increases in productivity and reductions in expenditures" is a rationale underlying the use of average schedules. *Policy and Rules Concerning Rates for Dominant Carriers*, 5 F.C.C.R. 6786, 6820 (1990). Nevertheless, the FCC rejected the argument that the use of residual ratemaking by state regulators, i.e., allowing companies to recover only 100% of their costs, was contrary to FCC policy stating:

---

**10.** The Commission asserts that, because Pine Tree did not challenge the 10.586% rate of return or the calculations underlying it (other than the cost of debt), it is now estopped from raising this issue. This assertion is without merit. In this instance, Pine Tree is not challenging the 10.586% rate of return but is challenging the commission's application of that rate of return to interstate revenues.

**11.** From 1987 to January 1, 1991, the FCC authorized local exchange carriers to earn a 12% rate of return on investment for their interstate access services. *Represcribing the Authorized Rate of Return for Interstate Services of Local Exchange Carriers*, 5 F.C.C.R. 7507, 7505 (1990). As of January 1, 1991, the authorized rate was changed to 11.25%. *Id.*

[I]t has always been our view as a matter of public policy that it would be inequitable for a company to recover more than its total costs. In fact, this Commission has previously declared that "[n]o company has a legal or equitable right to obtain more than its full costs." *Mid–Plains Tel. Co.*, 5 F.C.C.R. at 7054 (quoting *MTS and WATS Market Structure Average Schedule Companies*, 103 F.C.C.2d 1017, 1027 (1986)). Although the FCC's refusal to preempt use of residual ratemaking may appear inconsistent with its stated goal of allowing a utility to retain benefits that accrue from average schedule treatment, the FCC's decision was upheld by the Court of Appeals for the District of Columbia in *Crockett*, 963 F.2d at 1571–72, 1574 (specifically rejecting the inconsistency argument).

■ Finally, Pine Tree, citing *Maine Water Co. v. Public Util. Comm'n*, 482 A.2d 443, 456–57 (Me.1984), asserts that the commission's approach "use[s] revenues generated from interstate customers to benefit intrastate customers violat[ing] the State's prohibition against cross-subsidization." In *Maine Water Co.*, we acknowledged that a fundamental objective of ratemaking is to avoid cross-subsidization so that one class of customers is neither burdened by the losses from other service nor benefitted from its profits. *Id.* at 456. In *Maine Water Co.*, we "struck down an attempt by the Commission to effect a dollar-for-dollar 'flowthrough' of gains realized by Maine Water Company in selling [another of its] division[s]." *Millinocket Water Co. v. Public Util. Comm'n*, 515 A.2d 749, 753 (Me.1986). We distinguished the commission's actions in *Millinocket Water* from those in *Maine Water* because in *Millinocket Water*, the commission was using a "Company's parent as proxy for determining [the] cost of equity" and did not attempt to effectuate a "flowthrough." *Millinocket Water*, 515 A.2d at 753. The commission's actions in the case before us can be similarly distinguished from *Maine Water;* here, the commission relied on average schedules as a proxy to determine Pine Tree's interstate costs and did not attempt to effect a flow-through of

gains from Pine Tree's interstate activities to subsidize its intrastate activities.

## D. Interstate Billing and Collections

■ Local exchange carriers, like Pine Tree, can generate revenue by charging interstate carriers for sending bills to customers and performing collection services usually to customers within its own service territory. Pine Tree provides these billing and collection services to AT & T. During the test year, 1990, AT & T paid Pine Tree $96,418 for these services. Pine Tree's president, Timothy Hutchinson, testified that the company's expenses in providing this service were about eight or nine thousand dollars. Pine Tree argues that the commission impermissibly included Pine Tree's interstate billing and collection revenues in Pine Tree's total revenues. Pine Tree argues that any regulation of these services is outside the commission's jurisdiction. The commission asserts that the FCC has not preempted state regulation of interstate billing and collection services and that "since ... the billing and collection revenues are still to be regulated for jurisdictional separations purposes, this commission has no other alternative under the paradigm of residual ratemaking than to include those revenues as part of Pine Tree's total interstate revenue and hence its interstate costs for intrastate ratemaking purposes." The commission continues, "[a]ny other method of regulation would not ensure that Pine Tree does not receive any more or less than 100% of its total company revenue requirement."

We closely analyze FCC precedent in order to decide this issue. In 1986, the FCC concluded that "carrier billing or collection for the offering of another unaffiliated carrier is not a communications service for the purposes of Title II of the Communications Act." *Detariffing of Billing & Collection Services*, 102 F.C.C.2d 1150, 1168 (1986). The FCC also declined to exercise its authority to regulate such services pursuant to Title I of the Communications Act. *Id.* at 1170. The FCC continued:

[W]e have concluded that we should give *preemptive effect* to our decision with respect to [local exchange carrier] billing and collection for interstate services of interexchange carriers. State rate regulation of such billing and collection services is not required.... Therefore, we have decided to preclude such regulation.

*Id.* at 1177 (emphasis added). The FCC added, "the deregulation of billing and collection services should not shift costs between the state and interstate jurisdictions ... [but] merely removes some interstate costs from the regulated arena." *Id.* at 1175. In 1987, however, the FCC added, "we did not preempt *all* state regulation of billing and collection service." *Separation of Costs of Regulated Telephone Service from Costs of Nonregulated Activities*, 2 F.C.C.R. 1298, 1309 (February 1987) (emphasis added) (hereinafter *Separations I*). In a footnote, the FCC explained these remarks as follows:

> While we preempted state regulation of [local exchange carrier] billing and collection for *interstate* service of interexchange carriers ... we did not preempt regulation of billing and collection services for *intrastate* services.

*Id.* at 1350 n. 152 (citation omitted) (emphasis added).

In 1987, the FCC established a method of separating regulated and nonregulated activities. *See id.* at 1299. Under that scheme, a company would generally first separate its regulated from its nonregulated activities,[12] and then only the regulated activities would proceed to the jurisdictional separation phase. *Separation of Costs of Regulated Tel. Service from Costs of Nonregulated Activities*, 2 F.C.C.R. 6283, 6300 (October 1987) (hereinafter *Separations II*). The FCC has determined that billing and collection activities are deregu-

lated activities in the interstate jurisdiction but has allowed regulation in the intrastate jurisdiction; and because of this, unlike those services that are preemptively deregulated in both interstate and intrastate jurisdictions, billing and collection services remain subject to the jurisdictional separation process. *Separations I*, 2 F.C.C.R. at 1309 ("[W]e did not preempt all state regulation of [intrastate] billing and collection service ... [therefore] [w]e believe that billing and collection activities should continue to be accorded regulated accounting treatment."); *see also* 47 C.F.R. § 32.23 (1992). Because Pine Tree's revenues from interstate billing and collection services are not separated from its regulated activities prior to jurisdictional separations and because Pine Tree chose to use average schedules rather than a cost-based jurisdictional separation, the commission did not err by including Pine Tree's interstate billing and collection revenues in Pine Tree's total revenues for residual ratemaking purposes.[13]

 Moreover, even if the commission had committed error by including these costs, such error would be harmless because Pine Tree did not supply adequate evidence on which the commission could exclude expenses of interstate billing and collection services. Hutchinson testified that he estimated the companies expenses for billing and collection services based on Pine Tree's costs of printing bills and an estimate by Pine Tree staff as to time spent answering questions on interstate bills. Contrary to Pine Tree's assertion during oral argument that its cost separation study, excluded by the commission, contained an accurate separation of interstate billing and collection services expenses, that study did not do so. According to 47 C.F.R. §§ 36.378 (1992), account

---

12. "Preemptively deregulated activities and activities (other than incidental activities) never subject to regulation will be classified for accounting purposes as 'nonregulated.'" 47 C.F.R. § 32.23 (1992).

13. Furthermore, even if billing and collection services were considered nonregulated activities, the FCC has also held that "average schedule companies are exempt from the require-

ments [of separating regulated from nonregulated activities]." *Separations II*, 2 F.C.C.R. at 6300. The FCC reasoned that:

> Ratepayers are safeguarded from the potential burden of paying for nonregulated activities because our average schedule approval process automatically excludes the costs and expenses of nonregulated activities.
>
> *Id.*

number 6623, customer services, should be broken into three separate categories: (1) message processing expenses, (2) carrier access charge billing and collection expenses, and (3) other billing and collecting expenses. The expenses identified in the "other billing and collecting expenses" category are then further segregated according to 47 C.F.R. § 36.380 (1992). The study commissioned by Pine Tree did not segregate expenses to this extent; and, in fact, simply included one lump sum for all "customer services" expenses.[14]

## III.

## Rate of Return

### A. Hypothetical Capital Structure

 One of the commission's essential functions in the ratemaking process is the determination of an appropriate rate of return the utility will be permitted to earn.[15] *NET 1982*, 448 A.2d at 284. The commission generally determines a company's rate of return by combining the capital structure of the utility with the proper cost of capital. *Id.* In the case at bar, however, the commission did not rely on Pine Tree's actual capital structure, which included virtually no debt, and instead adopted a hypothetical capital structure of 60% equity and 40% debt.

Pine Tree, citing 35–A M.R.S.A. § 1306(1)–(2) (1988),[16] asserts that the commission erred in imposing this hypothetical capital structure without a prior showing that Pine Tree's rates were unreasonable. We disagree. Section 1306(2) expressly provides that if the Commission finds that "a term, condition, *practice*, act or service complained of is unjust, unreasonable, insufficient, unjustly discriminatory or otherwise in violation of this Title," then it "may by order establish or change terms, conditions, measurement, practice, service or acts, as it finds to be just and reasonable." 35–A M.R.S.A. § 1306(2) (1988) (emphasis added). Moreover, we have held that:

There are two well-recognized circumstances in which a utility commission might disregard a utility's "actual" capital structure and adopt a "hypothetical" capital structure for ratemaking purposes. This first occurs when the utility's actual debt-equity ratio may be deemed to be inefficient and unreasonable, because it contains too much equity and not enough debt, thereby necessitating an inflated rate of return.... The

public within the State." 35–A M.R.S.A. § 303 (1988).

**14.** In fact, the firm conducting the study stated to Pine Tree in a cover letter accompanying the study:

[A] more extensive analysis of [plant and expense] amounts is normally conducted as part of a cost study than is normally done as part of an audit. In addition to identifying potential misclassifications, additional breakdowns of selected accounts are needed for completion of a cost study. *For example, Account 6623, Customer Services, needs to be broken into approximately eight components for purposes of a cost study, [unlike the breakdown done for] financial reporting purposes [in which] this entire amount is booked as one lump sum....* [E]xtensive studies will need to be made to further allocate primary account balances to ensure precise cost allocation in compliance with FCC Part 36 rules. We did not complete this analysis....
(Emphasis added).

**15.** The amount on which the utility is permitted to earn this fair rate of return is known as the "rate base." *NET 1982*, 448 A.2d at 291. The rate base is established by fixing a "reasonable value upon all the property of a public utility used or required to be used in its service to the

**16.** 35–A M.R.S.A. § 1306(1)–(2) (1988) provide:

**1. Unjust rates.** If after a formal public hearing the commission finds that the rates, tolls, charges, schedules or joint rates are unjust, unreasonable, insufficient or unjustly discriminatory or otherwise in violation of this Title, it may fix and order substituted just or reasonable rate or rates, tolls, charges or schedules. In determining the justness and reasonableness of the order, the commission shall assure rate design stability.

**2. Unjust term, condition, practice, act or service.** If after a public hearing the commission finds that a term, condition, practice, act or service complained of is unjust, unreasonable, insufficient, unjustly discriminatory or otherwise in violation of this Title or if it finds that a service is inadequate or that reasonable service cannot be obtained, the commission may by order establish or change terms, conditions, measurement, practice, service or acts, as it finds to be just and reasonable. In determining the justness and reasonableness of the order, the commission shall assure rate design stability.

second circumstance occurs when the utility is part of a holding company system.

*New England Tel. & Tel. Co. v. Public Util. Comm'n,* 390 A.2d 8, 39 (Me.1978) (hereinafter *NET 1978* ). The commission in the case before us is well-within the first of the two well-recognized circumstances justifying the adoption of a hypothetical capital structure. Pine Tree does not challenge the reasonableness of the hypothetical structure adopted by the commission and the structure adopted was supported by sufficient evidence in the record.

### B. Cost of Debt

A second important step in determining a fair rate of return is the determination of the cost of equity and the cost of debt. *NET 1982,* 448 A.2d at 284. Pine Tree does not now challenge the cost of equity but does challenge the cost of debt determined by the commission. We have characterized the cost of debt as "the interest the utility must pay on its borrowed capital." *Id.* "Ordinarily, the cost of debt is not a complex issue because it involves merely a mechanical computation of the interest rates on a utility's various debt investments." *Mechanic Falls Water Co. v. Public Util. Comm'n,* 381 A.2d 1080, 1096 (Me.1977).

Determining the cost of debt in the case at bar, however, was complicated by the fact that Pine Tree had no debt financing in place at the time of the order. During the hearings, Pine Tree proposed a cost of debt of 10.83% which it based on currently available commercial lending rates. The commission staff proposed a debt cost of 9.5% based on rates obtained by other independent telephone companies and the cost of funds currently available from commercial lenders and the Rural Telephone Finance Cooperative (the RTFC).

The commission rejected both of these proposals stating that the "rate [at which] Pine Tree could actually obtain debt financing *now* is of only limited relevance." Instead the commission relied on the average weighted cost of imbedded debt for all of Maine's independent telephone companies,

6.965%, and imputed that cost of debt to Pine Tree. After making this determination, the commission stated that, "we are implicitly finding, of course, that Pine Tree should have included debt historically in its capital structure."

Pine Tree challenges the commission's decision to rely on the imbedded cost of debt rather than the cost of debt currently available. The first step in our review of such matters is to determine whether there is substantial evidence on the record to support the commission's conclusion. Although Pine Tree asserts that the evidence does not support the commission's conclusion, we disagree. The commission staff introduced an exhibit that reflected the average weighted cost of debt for Maine independent telephone companies; that average was 6.965%, the figure adopted by the commission. The second step in our review is limited to determining whether the commission's conclusion is unreasonable, unjust, or unlawful. *NET 1982,* 448 A.2d at 288. We reject Pine Tree's assertion that the commission abused its discretion by imputing a theoretical cost of debt. Although the evidence would also have supported findings of a higher cost of debt, the commission's use of imbedded debt costs was not unreasonable, unjust, or unlawful. The commission's decision to impose a cost of debt of 6.965% is also supported by the testimony of staff witness, Richard Kania, who testified that the Rural Telephone Bank currently offered telephone companies "like Pine Tree" a lending rate "in the range of 5.4%."

### IV.

### Total Adjusted Test Year Revenue Requirement

Pine Tree finally challenges the commission's decision that its president, Tim Hutchinson, was overcompensated. The commission first found that "Pine Tree has proven, albeit by a narrow margin that Mr. Hutchinson's test year base salary of $122,460 (excluding bonus) is not unreasonable." The commission also considered Pine Tree's fringe benefit plan and held that:

Because ... internal checks and balances tend not to exist in companies like Pine Tree, the utility must make a strong showing to the Commission that [bonus] expenses are reasonable. While a close call, we find here that Pine Tree made such a showing.

Despite finding Hutchinson's base salary and Pine Tree's bonus plan were both reasonable, the commission concluded that Hutchinson's total salary, consisting of his base salary of $122,460 and a bonus of $18,550, was "unreasonably high." The commission based its conclusion on the testimony of staff witness, Richard Kania. Kania testified that he conducted a study of the salaries of the chief executives of other Maine independent telephone companies and concluded that Hutchinson's compensation was "well over twice the average salary for other chief operating officers of Maine independent telephone companies." Pine Tree asserts that the commission's conclusion was an abuse of discretion and attacked the study produced by commission staff because it failed to account for such factors as the number of hours each executive spent working on telephone company activities.[17]

Although we may have reached a different conclusion, we find sufficient evidence in the record before us to support the commission's decision. Despite the study's failure to include the hours worked or the duties performed, the study showed that the average salary for independent telephone companies in Maine was less than half that of Hutchinson's salary. Furthermore, it is not an abuse of discretion for the commission to find that, although the base salary and bonus plan are both reasonable when standing alone, they are unreasonable when combined.

The entry is:

Order of the Commission affirmed.

All concurring.

---

17. Indeed, Kania admitted that he knew that several of the executives included in the study

worked only part-time on telephone company activities.